Having reviewed the record, the Full Commission finds no grounds to reverse the decision of the deputy commissioner and hereby affirms same, as modified in this opinion.
 ***********
The parties have entered into and the Full Commission approves the following:
 STIPULATIONS
1. At all times relevant to plaintiff's claims, an employer-employee relationship existed between plaintiff and defendant-employer, and the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. The parties stipulated that plaintiff's average weekly wage was $296.87.
3. The following documents are kept in the regular course of business of the Industrial Commission, are a part of the record of this case, and are attached to the Pre-Trial Agreement:
a. Form 19 submitted to Commission on 10 November 1998;
b. Form 18 submitted to Commission on 21 December 1998.
 ***********
Based on the greater weight of the credible evidence, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the deputy commissioner hearing, plaintiff was 55 years of age.
2. Plaintiff has a ninth grade education and has no significant formal education, training, skills or licenses. Plaintiff's employment history has consisted of primarily working in the garment and manufacturing industries.
3. Plaintiff was employed by defendant-employer at its Garland Shirt Factory for 16 years. Throughout most of her employment, plaintiff worked as a shirt inspector, a job also called "trim and examine" by defendant-employer. Plaintiff's employment as an inspector required her to trim small pieces of thread from recently sewn shirts and to inspect the shirts for flaws. Plaintiff held in her hand and repeatedly used a pair of snips throughout the course of her work shift. She manipulated the shirts with her fingers in order to remove the excess thread and inspect the shirts. The job also required plaintiff to move her hands over her head repeatedly in order to keep the shirts moving in production. Plaintiff often hit her hands on a board that was used to hold the shirts. Plaintiff was paid on a production basis, and physically inspected 350 to 400 shirts per day.
4. Over the course of the years plaintiff worked for defendant-employer, plaintiff developed pain and swelling in her hands, wrists and arms.
5. On Thursday, October 1, 1998, plaintiff reported to her supervisor, Landis Ammons, that she was experiencing pain in her hands and requested to be taken off her job. Ms. Ammons advised plaintiff to seek a note from her personal physician. On October 5, 1998, plaintiff went to see her personal physician, Eddie Powell, M.D. She presented to Dr. Powell with severe bilateral thumb, arm, and shoulder pain with numbness and losing strength in her hands. Dr. Powell observed tenderness over the carpal tunnels with decreased handgrip strength. Dr. Powell's initial assessment was radiculopathy versus neuropathy. Dr. Powell ordered a nerve condition study to be performed. Dr. Powell also wrote a note excusing plaintiff from work from October 2 through October 6, 1998.
6. On October 6, 1998, plaintiff at the request of defendants was examined by Carolyn Pope, a family nurse practitioner at Clinton Medical Clinic. Plaintiff reported that for a few months she had pain in both thumbs, numbness and tingling in all of her fingers. Ms. Pope's suspected diagnosis was carpal tunnel syndrome. Ms. Pope recommended that plaintiff try a new work area that would requires less repetitive activity, and this recommendation was communicated to defendant-employer.
7. Plaintiff returned to work on October 7, 1998. She was assigned the position of final inspector for one day, but was then returned to her former position. Plaintiff continued to experience pain, and was offered the job of joiner, which is a sewing position. Plaintiff declined to perform the job of joiner because, being familiar with this position, she felt it would cause too much pain in her hands and arms.
8. Defendant-employer next offered plaintiff the job of label sewer. Plaintiff attempted to perform the label sewer position, but found that when she did this work she experienced increased pain in her hands, and in addition, pain in her back and legs. The label sewer job required more fine finger and hand movements than the inspector job.
9. On October 12, 1998, plaintiff returned to Clinton Medical Clinic and was seen by Dr. Newton. Plaintiff presented with complaints compatible with carpal tunnel syndrome. Plaintiff reported having pain in her arms, neck, and in her back. Plaintiff had been switched over to her sewing job on that date and Dr. Newton was not sure of the etiology of plaintiff's complaints. Dr. Newton advised plaintiff to continue to wear her wrist splints and to take Daypro.
10. When plaintiff returned to work, she attended a meeting with Lynwood Brown, the plant manager, Patty Gazeleh, the human resources director, and Marilyn Stevens, the chief union steward. Plaintiff reported at this meeting that it was difficult for her to perform the label sewer job and gave her opinion that she could no longer perform the inspector job because it was too repetitive. Mr. Brown told plaintiff that if she could not perform the label sewer job, that she would have to go home and not come back to work until she was able to perform work that her employer would have available. Plaintiff has not worked for defendant-employer since October 12, 1998. Defendant-employer has not offered plaintiff any alternative less repetitive work other than the jobs already discussed.
11. Plaintiff was seen by Dr. Powell on October 13, 1998. Dr. Powell's diagnosis was unchanged. The nerve conduction studies were not yet performed. Dr. Powell advised plaintiff to continue to wear the wrist splints and advised plaintiff not to work for 30 days.
12. On October 14, 1998, plaintiff was seen at Triangle Orthopaedic Associates by Samuel T. Dyer, a physician's assistant. Mr. Dyer noted positive Tinel's sign and positive Phalen's sign bilaterally. Mr. Dyer's impression was bilateral median neuritis, cervical strain. He gave plaintiff a note for limited duty for three weeks.
13. Dr. Powell saw plaintiff on October 26, 1998. Plaintiff's nerve conduction studies were negative. Dr. Powell thought plaintiff had severe tendinitis of the carpal tunnel of the wrist, ruling out a slipped disk of the cervical spine, with questionable arthritis. Dr. Powell ordered a MRI of plaintiff's cervical spine. He placed plaintiff on a Medrol dose pack, advised her to wear her wrist splints, and told her that the wrist pain was secondary to severe tendinitis of the wrists.
14. On November 2, 1998, Dr. Powell noted that plaintiff's deep tendon reflexes were within normal limits, most likely as a result of plaintiff's absence from the workplace.
15. Dr. Powell continued to treat plaintiff through the winter of 1998-99 and referred plaintiff to Dr. Moss based on a suspected need for carpal tunnel surgery.
16. Dr. Moss first examined plaintiff on February 17, 1999, when he gave the probable diagnosis of carpal tunnel syndrome despite the negative EMG results. Dr. Moss also noted diabetes with possible radiculopathy and cervical spondylosis.
17. On April 13, 1999, plaintiff had repeat nerve conduction studies which were consistent with bilateral ulnar motor neuropathy, left median motor neuropathy, and right ulnar sensory neuropathy.
18. Dr. Moss' final diagnosis was bilateral carpal tunnel syndrome, left ulnar nerve tunnel syndrome, and right ulnar compression syndrome. Dr. Moss performed carpal tunnel release and release of Guyon's canal surgery bilaterally on April 20, 1999, and May 11, 1999. Plaintiff has obtained some relief from her surgeries, but still experiences pain in her hands.
19. Plaintiff's employment with defendant-employer caused or significantly contributed to her neuropathies of the ulnar and median nerves and the development of her carpal tunnel syndrome. Plaintiff's work as an inspector was repetitive and exposed plaintiff to a greater risk of contracting or aggravating her ulnar and median neuropathies and carpal tunnel syndrome than members of the general public who are not so employed.
20. Plaintiff acted reasonably when she rejected the positions offered by defendant-employer, because these positions would have placed her at a risk of worsening or aggravating her ulnar and median neuropathies and carpal tunnel syndrome.
21. From approximately January to March 2000, plaintiff tried working at Phillips Seafood, a Maryland company, packing crabs. She was paid $6.00-plus per hour and worked an average of 31 to 32 hours per week. Plaintiff left that job because it caused her to have increased pain in her hands and arms. Dr. Powell was not pleased when he discovered that plaintiff had attempted this employment, because of the worsened condition that he observed.
22. Plaintiff's job at Phillips Seafood was not suitable employment for plaintiff because the cold temperatures required for maintaining freshness in seafood caused her condition to worsen.
23. Since leaving the seafood plant, plaintiff has continued to experience severe pain in her hands and arms, which has caused her to limit her daily activities.
24. The work performed by plaintiff with defendant-employer was a significant contributing factor to the pain that she continued to experience through the date of the deputy commissioner's hearing. Plaintiff's continued pain is the result of a combination of her employment with defendant-employer, the surgery she had to correct her occupational diseases, and her underlying diabetes. Dr. Powell has great concern about the potential for plaintiff losing the use of her hands.
25. Plaintiff has not looked for work since leaving the seafood processing plant because she does not believe she is able to work. She has applied for social security disability benefits. Dr. Powell believes that plaintiff is totally disabled from working and does not want her to attempt to return to work.
26. There is no evidence in the record that plaintiff has reached maximum medical improvement or that her condition has stabilized.
27. Due to plaintiff's age, educational level, and physical disabilities, it would be futile for plaintiff to search for employment.
28. The medical treatment by or at the direction of Dr. Moss and Dr. Powell was reasonably necessary to effect a cure and to provide relief of plaintiff's symptoms.
29. Plaintiff was paid $138.52 per week for 26 weeks from an employer sponsored disability plan. Defendant-employer asserts that the plan was 100% employer funded and that the plan is not entitled to seek reimbursement from plaintiff. Plaintiff's concern is that she might be required to repay the plan and that defendant will also reduce her workers' compensation benefits based on the payments she received from the disability plan, which would be a double credit to defendants.
 ***********
Based on the evidence of record, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. As a result of her employment with defendant-employer, plaintiff developed ulnar and median neuropathies and bilateral carpal tunnel syndrome, which conditions are due to causes and conditions characteristic of and peculiar to her employment as an inspector for defendant-employer and which are not ordinary diseases of life to which the general public is equally exposed outside of that employment. G.S.97-53 (13); Booker v. Duke Medical Center, 297 N.C. 458, 256 S.E.2d 189
(1979).
2. Plaintiff is entitled to temporary total disability benefits in the amount of $197.92 per week beginning October 12, 1998, and continuing until plaintiff returns to suitable employment or until further order of the Commission. G.S. 97-29. Defendants are entitled to an offset for wages earned by plaintiff in her position with Phillips Seafood. If the parties are unable to reach agreement concerning the amount of the credit for wages earned, either party may seek a hearing to resolve the issue.
3. Although defendants appear to concede the point, it is unclear from the evidence whether the short term disability benefits paid to plaintiff for 26 weeks at the rate of $138.52 per week was paid by a plan that is entitled to reimbursement. Defendants are entitled to withhold $3,601.52 from the accrued benefits owed to plaintiff as a credit toward benefits only if the short term disability plan is not entitled to reimbursement from plaintiff's recovery of workers' compensation benefits. If the plan is entitled to reimbursement from plaintiff's workers' compensation benefits, then defendants are not entitled to withhold this sum toward the credit. If the parties are not able to reach agreement concerning the nature of the short term disability plan and to whom the payments are owed, either party may seek a hearing to resolve this issue. G.S. 97-42.
4. Plaintiff is entitled to have defendants pay for all medical expenses, including the treatment by or at the direction of Dr. Powell and Dr. Moss, for the ulnar and median neuropathies and carpal tunnel syndrome for both hands, for so long as such examinations, evaluations, and treatment may be reasonably necessary to effect a cure, give relief, or tend to lessen plaintiff's period of disability, subject to the limitations of section 97-25.1. G.S. 97-25, 97-25.1.
5. Plaintiff has not reached maximum medical improvement, and this Opinion and Award does not address that issue. In the event that plaintiff reaches maximum medical improvement and the parties are not able to reach agreement on that issue and/or whether plaintiff is entitled to receive other or further disability benefits, then either party may request a hearing from the Commission to resolve this issue.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff total disability benefits in the amount of $197.92 per week beginning October 12, 1998, and continuing until further order of the Commission, subject to (1) an offset for wages actually earned by plaintiff while working for Phillips Seafood, (2) a credit for short term disability benefits received by plaintiff for a 26 week period at the rate of $138.52, but only if the short term disability plan is not entitled to reimbursement from plaintiff's workers' compensation recovery, and (3) a reasonable attorney fee to plaintiff's counsel as set forth below in this Award. Any accrued amount shall be paid in a lump sum, subject to the offset, the credit if applicable, and the attorney fee.
2. Defendants shall pay for all medical expenses, including the treatment by or at the direction of Dr. Powell and Dr. Moss for the ulnar and median neuropathies and carpal tunnel syndrome for both hands, for so long as such examinations, evaluations, and treatment may be reasonably necessary to effect a cure, give relief, or tends to lessen plaintiff's period of disability, subject to section 97-25.1.
3. A reasonable attorney fee of 25% is approved for plaintiff's counsel. Twenty-five percent of the lump sum due plaintiff shall be deducted and paid directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be paid directly to plaintiff's counsel.
4. Defendants shall pay all costs.
SIGNED this ___ day of ___, 2001
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN